[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 08-13675

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 31, 2010
JOHN LEY
CLERK

D.C. Docket No. 07-10019-CR-JLK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALEXIS DE LA CRUZ SUAREZ,
a.k.a. Alexis de la Cruz,
RAMON BARRABI-PUENTES,
a.k.a. Ramon Barrabi,

Defendants-Appellants.

No. 08-13808

D.C. Docket No. 07-10019-CR-JLK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE VAZQUEZ,

                                        Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(March 31, 2010)

Before CARNES and HULL, Circuit Judges, and GOLDBERG,[*] Judge.

GOLDBERG, Judge:

In December 2007, a federal grand jury returned a superseding indictment against Appellants Alexis De La Cruz Suarez ("De La Cruz"), Ramon Barrabi Puentes ("Barrabi"), and Jose Vazquez ("Vazquez"), and three other co-defendants. The indictment charged the Appellants with conspiracy in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) to commit alien smuggling in violation of 8 U.S.C. § 1324(a)(1)(A)(iv), and to bring aliens into the United States at a place other than a designated port of entry in violation of 8 U.S.C. § 1324(a)(1)(A)(I) ("Count 1"); and attempting to bring aliens into the United States for the purpose of commercial advantage and private financial gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii)

_____

[*] Honorable Richard W. Goldberg, Judge. United States Court of International Trade, sitting by designation.

2

and 18 U.S.C. § 2 ("Counts 2-35"). Vazquez was charged with 35 additional counts of attempting to bring aliens into the United States for the purpose of commercial advantage and private financial gain ("Counts 36-70"). Barrabi was charged with 66 additional counts of attempting to bring aliens into the United States for the purpose of commercial advantage and private financial gain ("Counts 36-101"). After a joint trial, a jury found the Appellants guilty as to Count 1. As to the remaining counts, the Appellants were either acquitted, or the charges were dismissed.[1]

On appeal, the Appellants, either separately or jointly, challenge several rulings made by the District Court during trial regarding: (1) a Motion to Dismiss the Indictment; (2) a Motion to Suppress Electronic Surveillance; (3) the admission of a prior inconsistent statement; (4) a Motion for Judgment of Acquittal; and (5) a Motion for Mistrial. They also raise various issues with regard to their sentences: (1) De La Cruz and Vazquez challenge an enhancement to their sentencing guidelines calculation under U.S.S.G. § 3C1.2, for utilizing a special skill to facilitate the offense; (2) De La Cruz also challenges enhancements to his sentence pursuant to U.S.S.G. §§ 3C1.2 and 2L1.1(b)(6), arguing that they amounted to

---

[1]The Superseding Indictment included an additional charge concerning criminal forfeiture pursuant to 18 U.S.C. § 982(a)(6)(A) that is not at issue on appeal.

impermissible double counting; (3) Vazquez argues that the District Court improperly calculated his guideline range by including certain inappropriate enhancements; (4) Vazquez also challenges the district court's refusal to apply a reduction for acceptance of responsibility; (5) Barrabi and Vazquez jointly argue that the District Court erred in determining that the statutory maximum penalty for the conspiracy offense was 10 years' imprisonment;  and (6) Barrabi maintains that his sentence is procedurally and substantively unreasonable.  As explained further below, we AFFIRM the rulings of the District Court and the sentences imposed upon the Appellants.

## BACKGROUND

A joint task force consisting of the FBI and the U.S. Coast Guard, with the assistance of confidential informants, uncovered an operation that smuggled individuals from Cuba to the Florida Keys.  According to the evidence at trial, from approximately June 2005 to March 30, 2007, Barrabi ran the operation and offered undocumented Cuban nationals boat transportation to the United States for the price of $10,000 per person.  With information gathered from the investigation and from a month-long authorized wiretap on Barrabi's two cellular phones, three smuggling trips were intercepted.  Each smuggling trip involved a similar course of

conduct. Barrabi would arrange for two vessels to leave the Florida Keys–a primary vessel to pick up the aliens from Cuba, and a secondary vessel to provide supplies and fuel to the primary vessel. Through the use of satellite telephones, Barrabi remained in close contact with the crew aboard the transport vessel during the trip. The primary vessel would travel to Cuba, and return with migrants dropping them near shore in the Florida Keys.

On February 21, 2007, Vazquez piloted a 32-foot Scarab boat and was stopped by the Coast Guard en route from Miami to the Florida Keys. Vazquez called Barrabi about the stop, and explained that everything was fine. Vazquez then continued the trip to rendezvous with a second vessel, on which Barrabi was onboard. The second vessel provided fuel and equipment to Vazquez's vessel. Vazquez drove the now-equipped primary vessel to the Upper Florida Keys, where he delivered it to De La Cruz and another crew member, Janny Grijalva Gonzalez.[2] Vazquez then departed; and De La Cruz piloted the boat to Cuba. Intercepted calls revealed that the vessel picked up individuals from Cuba around 4:00 a.m.

On his return from Cuba, De La Cruz was approached by the U.S. Coast Guard. He ignored the Coast Guard's instructions to stop the vessel, and a two-

---

[2]Grijalva Gonzalez was an original co-defendant and entered a guilty plea. Pursuant to a plea agreement, he testified at the Appellants' trial.

hour chase ensued.  During the chase, De La Cruz instructed Grijalva Gonzalez to throw the onboard satellite phone and GPS overboard.  Once the Coast Guard was able to stop the vessel, 34 Cuban migrants were observed onboard.  The boat was designed to carry approximately 10 to 12 passengers, and there were no life jackets available.  The migrants were interviewed by the Coast Guard for potential political asylum purposes, and 33 of the 34 individuals were repatriated.[3]

In planning the second intercepted trip, Barrabi and Vazquez were overheard discussing the retention of a vessel for the trip.  A boat was eventually obtained from Edelsis Lozano.[4]  Similar to the first trip, Barrabi and Vazquez met on two separate vessels, and exchanged supplies.  The primary vessel was piloted to Cuba and returned to the Florida Keys with 35 Cuban migrants.  The vessel was pursued by the Coast Guard both going to and returning from Cuba.

During the third intercepted trip, 31 Cuban migrants were discovered onboard the vessel by law enforcement.

Prior to their arrest, Barrabi had begun planning future smuggling trips, and had contacted Vazquez to obtain more vessels.

---

[3]One migrant was sent to Guantanamo Bay based on a potentially credible asylum application.

[4]Lozano was also a named co-defendant in the Superseding Indictment.  He was tried jointly with the Appellants and was found not guilty on all counts.

**DISCUSSION**

The Appellants challenge several rulings made by the court on evidentiary issues, various motions brought throughout trial, and sentencing calculations. Some issues have been argued by an individual Appellant, while others were raised by multiple Appellants or adopted post-briefing.[5]

I. Motion to Dismiss the Indictment

De La Cruz contends that the District Court erred in denying his motion to dismiss the indictment for loss of testimonial evidence that may have been favorable to him. A district court's denial of a motion to dismiss an indictment is reviewed for an abuse of discretion. United States v. Waldon, 363 F.3d 1103, 1108 (11th Cir. 2004).

In a statement to the government given approximately six weeks after his arrest, De La Cruz claimed that the trip he made on February 21, 2007 to Cuba was to assist Grijalva Gonzalez in bringing back his wife and two children. According to De La Cruz, upon his arrival to Cuba, a large group was waiting and insisted upon boarding the boat. He stated that he could not get the people off the boat, that he was threatened with a "sharp metal object," and that he was forced to leave

---

[5]Vazquez was granted leave by this Court to adopt his co-Appellant's arguments with regards to issues discussed here as I., II., IV., V., and VI.E.

Cuba with all of them aboard. De La Cruz argues that after stopping the boat, the Coast Guard should have questioned the 34 Cuban migrants before repatriating them, not just as to any legitimate asylum claims, but also to ascertain what they knew about the offenses committed. He claims that his due process rights under the Fifth Amendment and his compulsory process rights under the Sixth Amendment were violated because of his inability to question those individuals before their repatriation, and that the district court should have dismissed the indictment for loss of testimonial evidence.

At the two evidentiary hearings held on this motion,[6] FBI Special Agent Jennifer Himes testified. She explained that the repatriation was executed according to standard U.S. Coast Guard operating procedure, and that she had not been involved in the decision to repatriate the migrants. She also testified that she did not believe that the migrants were questioned about facts relating to the boat trip nor about De La Cruz and Grijalva Gonzalez. At the second evidentiary hearing, Agent Himes stated that De La Cruz had been interviewed on February 23, 2007, two days after the interdiction. Agent Himes clarified that at this interview,

<hr>

[6]After an evidentiary hearing, the motion was denied by the district court without prejudice. De La Cruz later renewed the motion. The Magistrate Judge reviewed the motion, held a second evidentiary hearing, and recommended that it be denied. The district court adopted the report and recommendation and denied the motion a second time.

De La Cruz made no mention that he had been threatened by the Cuban migrants awaiting his boat, nor that they had forced their way onto the boat. These claims were not mentioned until several weeks later on April 4, 2007, when Agent Himes interviewed De La Cruz.

To show a violation of his due process rights or compulsory process rights, De La Cruz is required to show that there was a reasonable basis to believe that the testimony would be material and favorable to him, and that the government had acted in bad faith in repatriating the aliens. United States v. Valenzuela-Bernal, 458 U.S. 858, 872-73 (1982); United States v. Schaefer, 709 F.2d 1383, 1386 (11th Cir. 1983); see also United States v. Gastelum-Almeida, 298 F.3d 1167, 1174 (9th Cir. 2002). The Appellant meets neither prong of this test. "The mere fact that the Government deports [illegal-alien] witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment." Valenzuela-Bernal, 458 U.S. at 872-73.

De La Cruz made no showing, other than his own conclusory allegations, that the testimony of the repatriated migrants would have been material to the case, and favorable to him. He merely states that the Government should have been aware that the migrants had information material to the case, and should have

9

questioned them prior to repatriating them. Notably, De La Cruz never mentioned any threats or compulsion to take the migrants aboard until he was interviewed again weeks after the Coast Guard's interdiction and his arrest. As the Magistrate Judge recognized, the statements made in the April 4 interview are inconsistent with his statements shortly after he was stopped by the Coast Guard. Further, there were three cooperating migrants who testified about the boat trip at trial, and none corroborated De La Cruz's story about coercion and threats. In addition, Grijalva Gonzalez testified, and the jury was able to consider his testimony in their deliberations.

De La Cruz likewise did not show any bad faith on behalf of the government in choosing to repatriate the migrants. According to Agent Himes's testimony, the Coast Guard was simply following standard operating procedure in returning 33 of the migrants to Cuba. Since De La Cruz made no statements that he had been threatened until weeks after the incident, the government, at the time, would have been unaware of any material or favorable testimony the migrants could have offered.

Because De La Cruz did not meet his burden of showing either that the repatriated migrants' testimony would have been material and favorable to him, or

that the Government acted bad faith, the District Court did not abuse its discretion in denying the motion to dismiss the indictment.

II. Motion to Suppress Electronic Surveillance

Prior to trial, Barrabi and De La Cruz filed motions, which were later adopted by Vazquez, to suppress all evidence obtained through the electronic surveillance of Barrabi's two cellular phones. After two evidentiary hearings and in accordance with the Magistrate Judge's recommendation, the district court denied the motions. A district court's denial of a motion to suppress evidence is reviewed as a mixed question of law and fact, with the rulings of law reviewed de novo and the findings of fact reviewed for clear error, in the light most favorable to the prevailing party. United States v. Boyce, 351 F.3d 1102, 1105 (11th Cir. 2003).

De La Cruz, Barrabi, and Vazquez argue that the issuance of the wiretap on Barrabi's cell phone was premature. Title 18 U.S.C. § 2518(1)(c) requires that an application for electronic surveillance include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." The Appellants argue that this requires the government's affidavit to show with specificity why ordinary means of investigation have failed, and that Agent

Himes's affidavit neglected to explain why the traditional methods of investigation were insufficient. According to the Appellants, other less intrusive investigative methods were available to the government, such as continued use of confidential informants and consensually recorded conversations. Thus, they argue that the wiretap should not have been authorized and the evidence obtained from it is suppressible as fruits of the poisonous tree.

The required explanation of other investigative procedures in an electronic surveillance application is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12 (1974). The affidavit in support of a search warrant "must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves." United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986). However, a comprehensive exhaustion of all possible investigative techniques is not necessary before applying for a wiretap. United States v. Alonso, 740 F.2d 862, 868 (11th Cir. 1984). The statute was not intended "to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted,

but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." Id.

Agent Himes's testimony regarding the contents of the affidavit provides ample support for the authorization of the wiretap. Agent Himes of the FBI testified to the prior investigative techniques that had been employed and the extent of their success.[7] This information had been included in her original affidavit when applying for the wiretap. However, despite the information obtained from other methods, she testified that she felt that a wiretap was necessary to determine the scope of the conspiracy, and all of its members.[8] She also testified that the prolonged use of physical surveillance was not feasible because the agents surveilling Barrabi were increasingly likely to be discovered. Pen registers and trap and trace devices were not entirely useful because of the probability of multiple subscribers to the previously identified phone numbers and the frequent use of aliases. Agent Himes also stated that the use of search warrants would not have been appropriate because it would likely have alerted co-conspirators to the

_____

[7] She explained that five confidential informants had been employed, one of which had engaged in consensual monitoring on one of the target telephones. Pen registers on the two target cellular phones were utilized, and resulted in the identification of various persons involved in the smuggling operation. Physical surveillance was conducted. Government agents also obtained information from real estate properties and bank accounts owned by Barrabi. At least one trash pull was conducted at Barrabi's residence.

[8] The wiretaps led to indictments of 12 individuals not previously known to the government.

ongoing investigation. The Magistrate Judge found her to be a "highly credible witness whose testimony was straightforward and candid." Agent Himes sufficiently described the prior investigation methods employed in the case, and was not, as the Appellants argue, required to comprehensively exhaust all other techniques before requesting authorization for electronic surveillance.

Additionally, the Appellants argue that the evidence obtained from the wiretap should be suppressed because the government failed to comply with the minimization requirement for electronic surveillance. Electronic surveillance must be "conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." Scott v. United States, 436 U.S. 128, 140 (1978). Agent Himes defined minimization as "the act of stopping to hear the audio content of a call based on the fact that there is a privileged call either between a lawyer, a priest, personal relative, something of non-legal nature." Conversations lasting less than two minutes are considered too brief "to identify the caller and characterize the conversation as merely social or possibly tainted."

United States v. Bynum, 485 F.2d 490, 500 (2d Cir. 1973). A standard of reasonableness is applied to the government's actions regarding electronic interceptions. United States v. Moody, 977 F.2d 1425, 1433 (11th Cir. 1992). The Appellants argue that the government made no true effort to separate relevant calls from personal ones because only 92 of the total 3,600 calls were minimized. Based on the numbers, Appellants simply suggest that more calls should likely have been minimized.

At the evidentiary hearing, the government's evidence showed that there were a total of 4,866 calls made during the duration of the wiretap. Of these calls, 3,365 were less than one minute in duration. A substantial number of calls contained no communications and resulted in hangups. 642 calls lasted longer than two minutes. A total of 92 calls were minimized, 70 of which were longer than two minutes.

Agent Himes testified that the agents ceased monitoring any call "when it pertained to legal subjects and the target." They also ceased monitoring calls of a personal nature.[9] The vast majority of the calls had been so short (less than one

___

[9]Some calls between Barrabi and his wife were not minimized because she was listed as a target in the affidavit in support of the electronic surveillance application. See United States v. Malekzadeh, 855 F.2d 1492, 1496 (11th Cir. 1988) (the government does not have a duty to minimize calls where a husband and wife are targets and believed to be involved in the conspiracy under investigation).

minute) that it was not possible to determine whether they should be minimized before they were over. As stated above, Agent Himes's testimony was found to be credible and believable. Evidence that a small number of calls were minimized does not, by itself, indicate that the minimization procedures used by the government were unreasonable. Appellants did not provide sufficient evidence to show otherwise.

Accordingly, the District Court did not err in denying the motion to suppress evidence obtained from the electronic surveillance.

III. Admission of a Prior Inconsistent Statement

De La Cruz argues that the district court should have permitted the introduction of a prior inconsistent statement by a witness. A district court's admission or denial of evidence is reviewed for abuse of discretion. United States v. Smith, 122 F.3d 1355, 1357 (11th Cir. 1997). "Even if the district court abused its discretion by admitting or excluding evidence, the conviction must be affirmed unless the defendant can meet its burden of demonstrating that substantial rights were affected by the error." United States v. Saget, 991 F.2d 702, 709 (11th Cir. 1993).

Hector Suarez Gonzalez, one of the individuals on board the vessel driven by

De La Cruz and interdicted by the Coast Guard, was interviewed by Agent Himes on September 26, 2007. Agent Himes recorded in her summary of the interview that Suarez Gonzalez stated, "The captains noticed that the boat was sitting very low in the water and were concerned. However, no one wanted to exit the boat." Suarez Gonzalez testified at trial. When questioned on cross-examination about the overcrowded conditions on the boat, he responded, "I don't know anything about that." De La Cruz's defense counsel sought to refresh Suarez Gonzalez's recollection by showing him a summary of his FBI interview testimony. Suarez Gonzalez denied recalling his prior statement about the boat sitting low in the water.

De La Cruz's defense counsel later argued for admission of Suarez Gonzalez's initial statement. Defense counsel stated that the inconsistency in the statements was material because it provided support for De La Cruz's argument that he only intended to pick up Grijalva Gonzalez's family in Cuba, and was concerned about the number of people onboard the boat. The district court refused to admit the statement and denied defense counsel the opportunity to recall Agent Himes to the stand to ask her about Suarez Gonzalez's original statement reasoning that the statement was not material to the argument. The district court specifically

17

stated, "I think the fact that the boat was overloaded or not overloaded would not have any real relevancy to that or materiality to that." The district court added that De La Cruz had other opportunities, such as the testimony of Grijalva Gonzalez, to support his position.

On appeal, De La Cruz maintains that Suarez Gonzalez's original statement was relevant to impeach Suarez Gonzalez as a witness, and that it was also proof of De La Cruz's state of mind at the time the boat was loaded.

"Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same...." Fed. R. Evid. 613(b). A witness may be impeached with a third-party statement only if he has adopted it as his own. Saget, 991 F.2d at 710. A witness may not be impeached by a non-verbatim statement, i.e., one that is in a government prepared summary, "which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations." Id. (quoting Palermo v. United States, 360 U.S. 343, 350 (1959)). Here, the report was created by Agent Himes, and when questioned about the prior statement, Suarez Gonzalez stated he did not recall making it. De La Cruz was still

afforded the opportunity to support his argument with Grijalva Gonzalez's testimony, and to discuss it during closing arguments.

Contrary to the Appellant's argument, the statement is not an exception to the hearsay rule as an admission of the declarant's state of mind. See Fed. R. Evid. 803(3). It was not offered as "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition." Id. The statement was made after the fact, not at the time of the incident. In addition, the state of mind in the exception "refers to the state of mind of the declarant, not to the state of mind of the listener or hearer of the statement." United States v. Arbolaez, 450 F.3d 1283, 1290 n.6 (11th Cir. 2006). De La Cruz was not the declarant of the statement in question.

The District Court did not abuse its discretion in refusing to admit Suarez Gonzalez's prior statement.

IV. Motion for Judgment of Acquittal

The Appellants challenge the denial of their Rule 29 Motion for Judgment of Acquittal and their Renewed Motion for Judgment of Acquittal and/or Motion for New Trial filed post-trial. "Whether the record contains sufficient evidence to

support the jury's verdict is a question of law subject to <u>de novo</u> review." <u>United States v. To</u>, 144 F.3d 737, 743 (11th Cir. 1998).

The Appellants present two arguments supporting their claim that the Motion for Judgment of Acquittal should have been granted. They first argue that the trial court did not have jurisdiction over the incident since the interdiction occurred on the high seas, 40 miles off the coastline, and not within the territorial limits of the United States. <u>See</u> <u>Yenkichi Ito v. United States</u>, 64 F.2d 73, 75 (9th Cir. 1933) (typically the territorial domain of the United States extends three miles from its shore). Notwithstanding, a conspiracy may be prosecuted in any district where the agreement was made or where an overt act took place. <u>United States v. Perez-Herrera</u>, 610 F.2d 289, 291 (5th Cir. 1980); <u>Yenkichi Ito</u>, 64 F.2d at 76. Here, trial evidence showed that multiple acts in furtherance of the alien smuggling conspiracy occurred in southern Florida, including Barrabi's house in Miami and the designated drop-off and pick-up points in the Florida Keys. Even though the actual migrant interception took place on the high seas, the organization of the plan and the arranging and transportation of the boats took place in southern Florida, giving the trial court proper jurisdiction over the case. This argument is meritless.

The Appellants also claim that the government failed to prove that the Southern District of Florida was the appropriate venue for the case.

For purposes of venue, the government must prove by a preponderance of the evidence that the crimes occurred within the district of trial. United States v. Males, 715 F.2d 568, 569 (11th Cir. 1983). "[W]hen circumstantial evidence as a whole reasonably supports the inference that the crime was committed in the trial district, the government's burden is satisfied." United States v. Rivamonte, 666 F.2d 515, 517 (11th Cir. 1982).

In addition to the jurisdictional evidence described above, Agent Himes identified photographs of Barrabi's houses in Miami-Dade and Monroe Counties in southern Florida, where the coconspirators assembled for the smuggling trips. The surveillance agents testified to related activities that occurred in both counties. Evidence was introduced of departures from and arrivals to Barrabi's house in Miami, as well as evidence of the boat exchange that occurred at Marathon Key, Florida. A chart depicting the southern United States, the Florida Straits, and Cuba was also admitted into evidence. There were references to the Black Point Marina and to the cities of Miami, Islamorada, and Tavenier in southern Florida. As a whole, there was more than sufficient evidence that crimes were committed in the

trial district.

The District Court properly denied the Motion for Judgment of Acquittal.

V. Motion for Mistrial

Barrabi challenges the district court's denial of his motion for a mistrial. A court's refusal to grant a mistrial will be upheld unless an abuse of discretion has occurred. United States v. Christopher, 923 F.2d 1545, 1554 (11th Cir. 1991).

During closing statements, the prosecutor commented on testimony given by cooperating co-defendants. Attempting to bolster their credibility, she stated:

> You heard a lot of argument by defense counsel about [co-conspirators] Janny Grijalva Gonzalez, Enrique Manzano, Aramis Ramos Fragaso, Emilio Yanes. They're here. Their motivation was to reduce their sentence.
>
> And they made the argument to you they'd say anything in the world to reduce their sentence, to spend less time in jail. But you heard very important testimony from them.
>
> Yes, they're here to reduce their sentences, but who sentenced them? Two of them have already been sentenced, two are yet to be sentenced. It's Judge King. Their case is pending before Judge King, just like these gentlemen. Judge King decides what the sentence is going to be.
>
> Use your common sense, ladies and gentlemen. You think somebody's sentence is going to be reduced if they come here and tell something other than the truth?

Defense counsel immediately objected to the statement as improper prosecutorial vouching; the objection was sustained. Based on the prosecutor's comments, Barrabi later moved for a mistrial; the motion was denied. He also moved for a new trial for several of the same reasons he had argued in his mistrial motion; this was also denied. On appeal, Barrabi renews his argument that it was inappropriate for the prosecutor to make personal assurances as to a witness's veracity, and that the comments unfairly prejudiced the jury against him.

To establish prosecutorial vouching, a party must show that "(1) the prosecutor placed the prestige of the government behind the witness by making explicit [personal] assurances of the witness's credibility, or (2) the prosecutor implicitly vouched for the witness's credibility by implying that evidence not formally presented to the jury supports the witness's testimony." United States v. Cano, 289 F.3d 1354, 1365 (11th Cir. 2002). However, prosecutorial misconduct, such as vouching, is "a basis for reversing an appellant's conviction only if, in the context of the entire trial in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused." United States v. Lopez, 898 F.2d 1505, 1511 (11th Cir. 1990). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks,

23

the outcome of the trial would be different." United States v. Hall, 47 F.3d 1091, 1098 (11th Cir. 1995).

Here, there were multiple attempts to ameliorate any possible prejudice to the jury caused by the prosecutor's comments. In sustaining defense counsel's objections to the prosecutor's statements, the district judge instructed the jury to disregard the comments. The jury was advised that the testimony of witnesses with regard to their expectation of receiving "some help or some reduction" that "only the Government can move for" was to be evaluated "with greater care than that of the ordinary person that comes in and testifies." The judge also informed the jury that it would include in its final charge guidance about how to evaluate such a witness's testimony, but that the jury remained the sole judge of witness credibility. A jury is presumed to follow its instructions. United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005). Barrabi does not argue that the jury failed to do so. In addition, defense counsel, during his closing argument, commented that the government witnesses had "a deal" with the government, and they had been offered "something much more valuable than money, and they present these witnesses to you as if they give a whit about telling the truth. All they care about is going home...." The jury was allowed to consider this statement as well.

There was significant evidence presented against Barrabi linking him to the smuggling conspiracy. He cannot show that but for the prosecutor's comments the jury would have found him not guilty. Since Barrabi did not show that his substantial rights were prejudiced by the prosecutor's comments, the district court did not abuse its discretion in denying the motion for mistrial.

## VI. Sentencing

The Appellants individually, and in some cases jointly, challenge several aspects of their sentences.

### A. Special Skill Enhancement

De La Cruz and Vazquez both argue that a two-level special skill enhancement should not have been added to their sentencing guideline calculation. The district court's legal interpretation of the term "special skills" is reviewed de novo, but whether the defendant possesses a special skill under § 3B1.3 of the Sentencing Guidelines is a factual finding reviewed for clear error. United States v. Foster, 155 F.3d 1329, 1331 (11th Cir. 1998). For a factual finding to be clearly erroneous, we "must be left with a definite and firm conviction that a mistake has been committed." Id.

"'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training, or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S. Sentencing Guidelines Manual § 3B1.3 cmt. n.4 (2009). If the special skill was used "in a manner that significantly facilitated the commission or concealment of the offense," a defendant's sentencing guidelines offense level is increased by 2 levels. § 3B1.3. If an "average person off the street" does not possess the skill, then the skill is considered "special" for the purposes of applying the enhancement. United States v. Calderon, 127 F.3d 1314, 1339 (11th Cir. 1997). De La Cruz and Vazquez argue that there are no special skills required to pilot the Scarab boat, and no license is required to do so.

Here, U.S. Coast Guard Officer Evan Sanborn attested that De La Cruz's ability to outrun a Coast Guard vessel during a two-hour chase at night in an overloaded boat was a special skill, particularly after the GPS and satellite phone were thrown overboard. Even with the assistance of a GPS, De La Cruz used specialized knowledge of the area to find a predetermined location in Cuba to pick up the migrants. The average person could not operate a vessel in this manner without the use of unique skills. See id. at 1339-40 ("[W]e do not believe that an

26

average person off the street would possess the requisite skills to captain a cocaine laden boat on the high seas from the Bahamas to a predetermined specific location in Southern Florida using a chart and compass at night without lights while taking care to elude detection by the throng of law enforcement agencies tasked with preventing the importation of cocaine."); see also United States v. Malgoza, 2 F.3d 1107, 1110-11 (11th Cir. 1993) (holding that advanced radio operating ability required special skills within the meaning of § 3B1.3).

Officer Sanborn also testified that Vazquez possessed special skills in boat mechanics because he had installed new engines to the vessels, and was able to take apart boats, perform fiberglass work, and install fuel tanks. In addition, Vazquez was able to navigate a boat at night in the Florida Keys with no lights. Similar to De La Cruz's skills, these are not skills possessed by the general public.

It was not clear error for the district court to rely on this testimony and apply the special skills enhancement.

B. Enhancement for Substantial Risk of Death and Enhancement for Reckless Endangerment

The district court applied two separate two-level enhancements to De La Cruz's sentencing guidelines calculation for intentionally or recklessly creating a

substantial risk of death or bodily injury to another person under U.S.S.G. § 2L1.1(b)(6) and for reckless endangerment during flight under U.S.S.G. § 3C1.2. De La Cruz maintains that applying both enhancements is double counting because two enhancements cannot be applied for the same conduct, i.e., overcrowding the boat.

We review a claim of double counting de novo. United States v. Dudley, 463 F.3d 1221, 1226 (11th Cir. 2006). "Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." United States v. Matos-Rodriguez, 188 F.3d 1300, 1309 (11th Cir. 1999) (quoting United States v. Alexander, 48 F.3d 1477, 1492 (9th Cir. 1995)) (citations and internal quotation marks omitted). "Double counting a factor during sentencing is permissible if the Sentencing Commission intended the result, and if the result is permissible because each section concerns conceptually separate notions related to sentencing." United States v. Adeleke, 968 F.2d 1159, 1161 (11th Cir. 1992) (citations and internal quotation marks omitted).

The two-level enhancement under § 2L1.1(b)(6) applies if the offense conduct intentionally or recklessly creates a risk of serious bodily injury to another.

This includes "carrying substantially more passengers than the rated capacity of a . . . vessel." § 2L1.1 cmt. n.5. The two-level enhancement under § 3C1.2 applies if the defendant recklessly creates a substantial risk of death or seriously bodily injury to another person in the course of fleeing from a law enforcement officer. If conduct justifying an enhancement under § 2L1.1(b)(6) is solely related to fleeing from law enforcement, then § 3C1.2 should not be applied. § 2L1.1 cmt. n.5. Similarly, an enhancement under § 3C1.2 should not be applied where "the offense guideline in Chapter Two, or another adjustment in Chapter Three, results in an equivalent or greater increase in offense level solely on the basis of the same conduct." § 3C1.2 cmt. n.1. When acts of reckless conduct are temporally and spatially separated, an enhancement based on separate guidelines provisions is permissible. Matos-Rodriguez, 188 F.3d at 1312.

Here, the enhancement for substantial risk of death was applied because De La Cruz had 36 individuals onboard a vessel designed to hold no more than 12 people, and there were no life jackets available. This qualified as a substantial risk of serious injury or death to the Cuban migrants under § 2L1.1(b)(6). In contrast, the enhancement for endangerment during flight under § 3C1.2 was applied because De La Cruz led the Coast Guard on a two-hour high-speed chase in the

29

darkness. Thus, the enhancements were not for the same conduct, and the district court did not commit impermissible double counting in applying both enhancements.

C. Enhancement for Substantial Risk of Death and Enhancement for Conspiring to Smuggle at Least 100 Aliens

Vazquez individually disputes two specific elements of his sentencing calculation. He contests the enhancements applied to his sentencing guidelines calculation for creating a substantial risk of death or bodily injury to another person, and for conspiring to smuggle 100 or more unlawful aliens. With regard to sentencing guideline calculation, we review for clear error a district court's factual findings, and review de novo the application of the law to those facts. United States v. Cover, 199 F.3d 1270, 1274 (11th Cir. 2000).

Vazquez argues that he should not have received an enhancement for substantial risk of death or bodily injury under U.S.S.G. § 2L1.1(b)(6) because he did not know how many people would be transported from Cuba and he was not personally involved with transporting the Cuban migrants. He states that he was only involved with maneuvering the boats within the Florida Keys. The district court ruled that it was reasonably foreseeable to anyone involved in a criminal

conspiracy to import aliens into the United States that the people transported would be placed in great risk of death and harm and serious bodily injury. The district court also rejected Vazquez's argument that he should not be found responsible for the transportation of at least 100 aliens because he was not aware of how many people would be transported.

Under U.S.S.G. § 2L1.1(b)(6), a two-level enhancement applies where the "offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." "Offense" is defined as "the offense of conviction and all relevant conduct under § 1B1.3 . . . unless a different meaning is specified or is otherwise clear from the context." § 1B1.1 cmt. n.1(H). Because no other meaning is specified or clear from the context, § 1B1.3(a)(1)(B) provides that "relevant conduct" includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." If a defendant is aware of the scope of a conspiracy outside of his individual actions, he may be held accountable for actions by co-conspirators even though he was not personally involved. See United States v. McCrimmon, 362 F.3d 725, 732-33 (11th Cir. 2004).

Vazquez had recommended certain vessels to Barrabi for the smuggling trips, and also installed commercial gas tanks on the vessels so that the vessels could transport larger numbers of people. Given the evidence presented at trial as to the scope of the smuggling conspiracy and Vazquez's specific knowledge of certain details of the conspiracy, it was certainly reasonably foreseeable to Vazquez that the individuals transported were placed at great risk of death or serious bodily injury.

Vazquez also contests a nine-level enhancement under § 2L1.1(b)(2)(C) because the offense involved transporting 100 or more unlawful aliens. A defendant's participation in a conspiracy is presumed to continue "until all objects of the conspiracy have been accomplished or until the last overt act has been committed by any of the conspirators." United States v. Arias, 431 F.3d 1327, 1340 (11th Cir. 2005).

Again, as a member of the conspiracy, Vazquez remains accountable for the actions of the other members. The trips that Vazquez participated in resulted in the transportation of 34 Cuban migrants on the first trip, 35 individuals on the second trip, and 31 more on the third trip. Furthermore, the Presentence Investigation Report stated, and Vazquez did not dispute, that he participated in a fourth

smuggling venture to transport 37 Cuban migrants to the United States.

Because of the scope of the conspiracy and Vazquez's participation in it, the district court did not err in apply these two enhancements to his sentence calculation.

D. Reduction for Acceptance of Responsibility

Vazquez disputes the denial of a Sentencing Guidelines reduction for his acceptance of responsibility. As stated above, we review for clear error a district court's factual findings, and review de novo the application of the law to those facts. Cover, 199 F.3d at 1274.

The Sentencing Guidelines provide for a two-level reduction when the "defendant clearly demonstrates acceptance of responsibility for his offense." § 3E1.1(a). "[A] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." § 3E1.1, cmt. n.1(a).

Vazquez argues that he should have received a two-level reduction for acceptance of responsibility because he attempted to plead guilty to the conspiracy charge, even though he did not admit guilt to the remaining charges. However, Vazquez proceeded to trial and falsely denied relevant conduct that the district

court later determined to be true.[10]  The district court did not err in denying this reduction.

E. Challenge to the Maximum Statutory Penalty

Barrabi and Vazquez argue that the maximum statutory penalty for the convicted offense should be five years, and not ten years.  We review a district court's legal interpretation of a statute de novo. United States v. Burge, 407 F.3d 1183, 1186 (11th Cir. 2005).

Section 1324(a) of United States Code Title 8 states that:

(1)(A) Any person who–

(i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien; ...

(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

(v)(I) engages in any conspiracy to commit any of the preceding acts . . .

---

[10] Immediately after arrest, Vazquez gave false statements to Special Agent Derrick Beyss of the FBI about staying with Barrabi, failed to acknowledge meeting another boat to exchange crew members, and lied about not calling Barrabi after being stopped by the Coast Guard.

shall be punished as provided in subparagraph (B).

Subparagraph (B) provides that:

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs--

(i) in the case of a violation of subparagraph (A)(I) or (v)(I) or in case of a violation of subparagraph (A)(ii), (iii), or (iv), in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under Title 18, United States Code, imprisoned not more than 10 years, or both;

(ii) in the case of a violation of subparagraph (A)(ii), (iii), or (v)(II), be fined under Title 18, United States Code, imprisoned not more than 5 years, or both….

Pursuant to <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), Barrabi and Vazquez maintain that because they were not charged nor was it proven that they committed the offense "for the purpose of commercial advantage or private financial gain," (B)(i) does not apply, and instead the five-year statutory maximum explained in (B)(ii) applies. However, Barrabi and Vazquez were convicted under 8 U.S.C. 1324(a)(1)(A)(v)(I), which according to (B)(i) does not carry the added burden of "commercial advantage or private financial gain" to reach the ten-year statutory maximum. Barrabi's 120-month sentence and Vazquez's 71-month

sentence did not exceed the 10-year statutory penalty.  This argument is meritless.

See United States v. Martinez-Candejas, 347 F.3d 853, 860 (10th Cir. 2003).

F. Reasonableness

Sentencing decisions are reviewed for an abuse of discretion. Gall v. United

States, 552 U.S. 38, 51 (2007).  Barrabi argues that his sentence is unreasonable

because the incorrect maximum statutory penalty was applied and because a

sentence at the lower end of the guideline range would have been more appropriate

and would have met the goals of 18 U.S.C. § 3553(a).

A sentence may be procedurally unreasonable if the district court improperly

calculated the guideline range, treated the guidelines as mandatory rather than

advisory, failed to consider the 18 U.S.C. § 3553(a) factors, selected a sentence

based on clearly erroneous facts, or failed to explain adequately the chosen

sentence. Gall, 552 U.S. at 51.  After an appellate court has determined that the

sentence is procedurally sound, the substantive reasonableness of the sentence must

be determined. Id.  This review involved examining the totality of the

circumstances, including the extent of any variance from the Guidelines range. Id.

"The fact that the appellate court might reasonably have concluded that a different

sentence was appropriate is insufficient to justify reversal of the district court." Id.

36

The burden of establishing unreasonableness belongs to the party challenging the sentence. United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007).

Barrabi's sentence is procedurally reasonable because, as the record indicates, the district court correctly calculated the advisory guideline range and considered the sentencing factors set forth in 18 U.S.C. § 3553(a).[11] As explained above, the correct statutory maximum was also applied. Furthermore, the record shows that the court considered the purposes and goals of sentencing, Barrabi's characteristics, and the seriousness of the offense.

Likewise, Barrabi's sentence is substantively reasonable. The district court has wide discretion in selecting from a reasonable range of appropriate sentences. United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). Here, the court imposed a sentence at the high-end of the guideline range, finding such a sentence was appropriate given the seriousness of the offense, and the duration of the conspiracy. Barrabi did not show that the sentence was unreasonable, in light of the record.

---

[11]Although the court did not expressly state that it considered the 18 U.S.C. § 3553(a) factors, the government discussed them at the sentencing hearing, and the court stated that it had considered the parties' statements. See United States v. Eggersdorf, 126 F.3d 1318, 1322-23 (11th Cir. 1997) (referencing the Government's opposition to Defendant's motion that discussed § 3553(a) factors, along with support in the record, indicated that the district court had provided sufficient reasons for denying a resentencing).

Thus, the district court was within its discretion in imposing Barrabi's sentence.

## **CONCLUSION**

Based on the foregoing reasons, we uphold the district court's evidentiary rulings, rulings on the motions, and sentencing decisions.

AFFIRMED.