[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 22, 2011
JOHN LEY
CLERK

No. 10-11028

_____

D. C. Docket No. 1:08-cr-20896-MGC-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DUANE MILLER, a.k.a. "D",

Defendant-Appellant.

_____

No. 10-11030

_____

D. C. Docket No. 1:08-cr-20896-MGC-6

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARTELLI GLOVER, a.k.a. "Jit",

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 21, 2011)

Before PRYOR and COX, Circuit Judges, and PANNELL,[*] District Judge.

PANNELL, District Judge:

After a jury trial, Duane Miller and Martelli Glover were convicted of conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. They appeal their convictions, and we affirm.

## I. Background

### A. Investigation and Indictment

As part of an investigation into activities at several "drug holes" in Miami, separate wiretaps were established on the cellular telephones operated by John Ladson and Kilvin Jasmin. Ladson and Jasmin each operated separate drug holes, but they discussed drugs sold, drug prices, and the presence of police in the area. Jasmin employed several people in his business of selling drugs, including Duane Miller, Martelli Glover, and Glover's cousin, Danny Glover.[1] The intercepted

_____

[*] Honorable Charles A. Pannell, Jr., United States District Judge for the Northern District of Georgia, sitting by designation.

[1] For clarity, only appellant Martelli Glover is referred to as "Glover." His cousin Danny Glover, a co-conspirator, is referred to by his full name.

phone calls revealed numerous instances when Jasmin, Miller, and Glover discussed the sale of drugs.

On June 9, 2009, a federal grand jury sitting in the Southern District of Florida returned a second superseding indictment against Miller and Glover, charging them with one count of conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. The indictment alleged a conspiracy beginning on or about March 1, 2007, and continuing through on or about September 26, 2008, and involving fifty grams or more of cocaine base (or "crack cocaine"), a detectable amount of cocaine, and a detectable amount of marijuana.

**B.    Motion to Suppress Wiretap Evidence**

Glover moved to suppress the wiretap evidence and requested an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In his motion, Glover argued that evidence of telephone calls which were intercepted by an authorized wiretap of Jasmin's telephone should be excluded because the affidavit submitted to support the authorization was insufficient to show the necessity for the wiretap in lieu of other available investigative techniques. Glover also argued that the affidavit omitted information that authorities had already obtained about the participants' drug supply and omitted

3

indications of participant identifications through the use of a confidential informant, which would eliminate the affidavit's premise that the wiretap was needed to gain such information and would prevent a finding of probable cause.

In the wiretap warrant affidavit, Wesley Mayes, an FBI special agent, stated that he sought a wiretap of a targeted telephone number in connection with an existing drug investigation. He stated that two previous wiretaps had been authorized and executed on the telephone of Ladson, a suspected drug dealer, and that this surveillance on Ladson revealed that the user of the target telephone, only known by the name "Fat," was associated with Ladson's drug business and was using the telephone to conduct drug activities. Mayes stated that he sought the wiretap to obtain the identities of the drug participants, the roles of the drug participants, the manner and location of the activities, and the method of distribution. He also stated that Fat's identity was unknown but that he was suspected of being a drug supplier. Additionally, Mayes stated that normal investigative procedures had been tried and failed, reasonably appeared unlikely to succeed if tried, or were too dangerous too employ.

At an evidentiary hearing on the motion to suppress, Mayes further testified that in the early stages of his investigation, he had become aware of Jasmin's connection with Ladson from a confidential informant who had participated in two

4

controlled drug buys from Ladson, but that he did not identify Jasmin as Fat until the wiretap of Fat's telephone intercepted a call from Fat to a bank in which Fat revealed identifying information. Mayes stated that he had known that Jasmin had been called "Fat Boy," but because this name and "Fat" were so common, he did not "make the leap" to assume Fat was Jasmin. Mayes stated that he did not use an informant, who might have known Jasmin's voice, to identify Fat's voice from intercepted conversations because revealing his methods to an informant could have jeopardized his investigation. Mayes then admitted that despite a contrary indication in his affidavit, Ladson had in fact revealed to a confidential informant that Jasmin was one source of his drug supply. Mayes said that his statement in the affidavit was an error on his part and that he had not clearly articulated his actual thought process in the affidavit.

The district court stated that necessity did not mean that the government must exhaust all investigative tools before seeking a wiretap and found that any omission or misrepresentation was neither significant as to what the authorizing judge knew nor to the outcome of the case. The district court denied the motion to suppress the wiretap evidence as to both defendants.

## C.    Miller's Rule 404(b) Motion

Miller filed a motion in limine seeking to preclude the government from

introducing certain evidence pursuant to Federal Rule of Evidence 404(b) and the "inextricably intertwined" doctrine. Miller had received notice that the government would seek to introduce at trial evidence relating to Miller's history of selling drugs with Jasmin beginning in 2001, as well as Miller's 2007 arrest for smoking marijuana with an accomplice in Miller's vehicle that contained over 70 grams of crack cocaine. Miller objected to the introduction of the evidence on the grounds that the evidence was neither inextricably intertwined with the charged conduct, nor was it extrinsic evidence allowed under Rule 404(b).

When the trial commenced, the court heard arguments on Miller's motion in limine. As to the evidence that Miller had been involved with Jasmin in dealing drugs since 2001, the district court admitted the evidence as inextricably intertwined with the charged conduct, i.e., to complete the story of the crime, not as extrinsic evidence of intent under Rule 404(b). The court also ruled that evidence of Miller's 2007 arrest was admissible, noting that the arrest occurred within the time period of the charged conspiracy, but not specifying the legal justification for its admission.

D.     **Trial Testimony and Motions for Mistrial**

At trial, Jasmin testified that he met Miller in 2001, that Miller eventually began working for him selling drugs, and that he continued to keep in touch with

6

Miller over the years from 2001 to 2007. Jasmin testified that Miller had begun to bag cocaine, deliver drugs, and serve as a lookout for the police in 2007. Jasmin further testified that on December 6, 2007, he was in his back yard with Miller and Danny Glover "hanging out" when Danny Glover got a phone call from Ladson. Jasmin stated that prior to Danny Glover receiving the call, Ladson had called Jasmin looking for Danny Glover to bag drugs for him. Jasmin testified that when Danny Glover got off the call, he asked Miller to go with him. Miller agreed, but Jasmin told Miller not to go. When government counsel asked Jasmin why he had not wanted Miller to go with Danny Glover, Jasmin replied that Miller had just gotten out of jail the day before. Miller's objection to this answer was sustained by the court.

Miller then moved for a mistrial on the grounds that the testimony that Miller had just gotten out of jail and had been separately involved with Ladson's drug organization was prejudicial and was not allowed by the court's ruling on the motion in limine. The court denied the motion for a mistrial but struck Jasmin's answer for inadequate foundation. The court also instructed the government to clarify its questions. The court asked Miller if he wanted a limiting instruction, but Miller declined the instruction.

The government also called a cooperating witness, Jamal Pratt, who testified

7

about Miller's participation in Jasmin's drug organization. During Pratt's testimony, the government asked Pratt if Miller would bring drugs to him to sell if Jasmin was not available. Pratt stated that Miller had to stop because he was arrested, and Miller objected and moved for a mistrial. The court directed the prosecutor to rephrase the question and at sidebar advised the prosecutor to better prepare his witnesses and to avoid those lines of questioning. The court denied the motion for mistrial.

The government also called as a witness William Goins, a police officer with the City of Miami Police Department. Goins testified that on September 6, 2007, he was on patrol when he smelled marijuana and saw a car parked in the middle of the road. He observed the occupants of the car, Miller and Danny Glover, pass a marijuana cigarette between them. When Goins pulled up next to the car, Miller, who was the driver, dropped the marijuana cigarette to the ground. Goins approached the car, asked them to get out, and placed them under arrest for marijuana possession. Goins then searched the vehicle and found a bag of crack cocaine that weighed 70.6 grams in the glove compartment. The court gave the jury an instruction that it should consider similar uncharged criminal acts of Miller only for the limited purposes of whether Miller had the state of mind or intent necessary to commit the charged crime.

## II. Standard of Review

Several standards of review govern this appeal. First, the denial of a motion to suppress wiretap evidence presents a mixed question of fact and law. The district court's rulings on legal issues are reviewed *de novo* and findings of fact for clear error in the light most favorable to the prevailing party. *United States v. Boyce*, 351 F.3d 1102, 1105 (11th Cir. 2003). Second, a district court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Baker*, 432 F.3d 1189, 1205 (11th Cir. 2005). Third, a district court's decision not to grant a mistrial is reviewed for abuse of discretion. *United States v. Emmanuel*, 565 F.3d 1324, 1334 (11th Cir. 2009). "The district court is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury," and a defendant "must show that his substantial rights are prejudicially affected. This occurs when there is a reasonable probability that, but for the remarks, the outcome of the trial would have been different." *Id.* (quotation marks omitted). "The mere utterance of the word jail, prison, or arrest does not, without regard to context or circumstances, constitute reversible error *per se*." *Id.*

## III. Discussion

### A. Wiretap Suppression

Glover first argues that the district court erred in denying his motion to

9

suppress the wiretap evidence and that the evidence should have been suppressed because the wiretap affidavit was insufficient to support necessity. The denial of a motion to suppress wiretap evidence presents a mixed question of fact and law. The district court's rulings on legal issues are reviewed *de novo* and findings of fact for clear error in the light most favorable to the prevailing party. *Boyce*, 351 F.3d at 1105. "The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed." *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986). "The affidavit in support of a search warrant must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves. However, a comprehensive exhausting of all possible investigative techniques is not necessary before applying for a wiretap." *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010) (quotation marks and citations omitted). Wiretap affidavits are evaluated in a "common sense fashion," and "the determination of when the Government has satisfied [the statutory] requirement must be made against flexible standards, and . . . each case must be examined on its own facts." *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978).

In this case, the district court correctly denied Glover's motion to suppress. First, Glover's argument that the affidavit was not sufficient to show necessity

10

lacks merit. Mayes stated in the affidavit and testified at the hearing that the investigation's scope was much broader than simply the identification of Fat or even other participants. The investigation sought to penetrate the drug activity and determine its entire scope, including source of supply, transportation routes, stash houses, and assets purchased, as well as the participants' identities. Since the investigation had such a broad scope, all contentions by Glover that the wiretap was not necessary because investigators knew or should have known that Fat was Jasmin are unavailing. In fact, Mayes emphasized that even if he had known Fat's identity, he still would have applied for the wiretap in an attempt to obtain the remaining information needed. Mayes also set forth the retroactive and prospective failure of several other investigative techniques. Given the broad scope of the investigation, the affidavit adequately established the necessity for the wiretap.

Second, Glover's attack on the veracity of the affidavit is premised on the omissions of the two controlled buys between an informant and Ladson. Since these omissions related to only one purpose of the investigation, the omitted information would not affect the overall finding of probable cause for the wiretap given the investigation's much broader scope.

For the reasons stated above, the district court did not err in denying

11

Glover's motion to suppress the wiretap evidence.

**B.    Miller's Rule 404(b) Motion**

Miller contends the district court erred in denying his motion in limine, which would have precluded the government from introducing evidence relating to Miller's history of selling drugs with Jasmin beginning in 2001, as well as Miller's 2007 arrest for smoking marijuana with an accomplice in Miller's vehicle that contained over 70 grams of crack cocaine. Miller maintains that the evidence was neither inextricably intertwined with the charged conduct, nor was it extrinsic evidence allowed under Rule 404(b).

A district court's evidentiary rulings are reviewed for abuse of discretion. *Baker*, 432 F.3d at 1205. Under Rule 404(b), extrinsic evidence of other uncharged crimes, wrongs, or acts is not admissible to prove a defendant's character in order to show action in conformity therewith. Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). To be admissible under Rule 404(b):

> (1) such extrinsic evidence must be relevant to an issue other than [the] defendant's character; (2) there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and (3) the probative value of the evidence cannot be substantially outweighed by undue prejudice, and the evidence must satisfy Rule 403.

12

*United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007). Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. However, "Rule 403 is an extraordinary remedy which should be used only sparingly, and the balance should be struck in favor of admissibility. Thus, in reviewing issues under Rule 403, [this court looks] at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Edouard*, 485 F.3d at 1344 n.8 (quotations and citations omitted).

Certain types of evidence of uncharged criminal activity are not considered "extrinsic" under Rule 404(b) and are admissible. *Id.* at 1344. This evidence falls outside of the scope of Rule 404(b) when it is:

> (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense. Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive, and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury. And evidence is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted. Nonetheless, evidence of criminal activity other than the charged offense, whether inside or outside the scope of Rule 404(b), must still satisfy the requirements of Rule 403.

13

Id. (quotation marks and citation omitted). *See United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992) (holding that inextricably intertwined evidence is intrinsic evidence that is admissible if its probative value outweighs the danger of prejudice).

### i. Miller's History of Drug Dealing

In the instant case, the district court did not abuse its discretion in admitting the evidence that Miller's history of drug dealing with Jasmin began in 2001, approximately six years before the commencement of the charged conspiracy. This evidence was intrinsic evidence admissible as inextricably related to the charged crimes. It established the beginning of the drug-dealing relationship between Jasmin and Miller and was linked in time and circumstances to the charged offenses; therefore, it also established the context of the charged conspiracy. *See Edouard*, 485 F.3d at 1344. *See also United States v. Costa*, 691 F.2d 1358, 1361 (11th Cir. 1982) (holding that evidence showing how a witness came to know the defendant as a cocaine dealer was admissible as inextricably intertwined). The evidence is also admissible as "structural" evidence under Rule 404(b). *See United States v. Lehder-Rivas*, 955 F.2d 1510, 1515–16 (11th Cir. 1992) (holding that "structural" evidence showing the inception of the conspiracy prior to the charged activities was admissible under Rule 404(b)).

14

This evidence also satisfies the requirement of Rule 403. Admission of evidence of the beginning of the drug-dealing relationship between Miller and Jasmin was not overly prejudicial to Miller, and any potential prejudice was outweighed by its value in showing the context of the charged conspiracy. The evidence described drug activities very similar to the charged conspiracy and with the same co-conspirator, Jasmin. *See United States v. Richardson*, 764 F.2d 1514, 1522 (11th Cir. 1985) (relying on similarity to enhance the probity of the evidence). The district court established limitations with respect to the admission of this evidence, and the statements were general references to the beginning of the Miller/Jasmin relationship. Given the broad discretion granted to trial courts in weighing prejudice and probative value, the district court did not abuse its discretion in allowing the evidence.

### ii.    Miller's December 2007 Arrest

As to the evidence of Miller's December 2007 arrest, the district court erred by assuming the conduct was intrinsic and by failing to apply Rule 404(b) to determine whether this extrinsic evidence was admissible. However, this error was harmless. Both parties agree that the drugs in question were not part of the Jasmin drug conspiracy but were instead part of the Ladson drug conspiracy. Furthermore, the evidence was not necessary to complete the story of Miller's

15

involvement in the Jasmin conspiracy, and its omission would not have rendered any testimony or evidence confusing or incomplete. *See Richardson*, 764 F.2d at 1521–22. As such, the district court should have analyzed the admissibility of this evidence as extrinsic evidence under Rule 404(b).

The evidence was admissible under Rule 404(b). Under clear precedent, extrinsic drug offenses are widely admissible for non-propensity uses in drug conspiracy prosecutions. *See United States v. Matthews*, 431 F.2d 1296, 1311 (11th Cir. 2005). In this case, the arrest is relevant to the issue of Miller's intent to conspire. In *United States v. Beechum*, 582 F.2d 898, 911-13 (5th Cir. 1978) (en banc), the court explained how the nexus between the intent of the charged crime and the intent of the "other act" can establish the requisite non-propensity relevance under Rule 404(b). By pleading not guilty to conspiracy charges, Miller put his intent to commit the charged crime at issue, and the evidence of his arrest was admissible to show this intent. *See United States v. Roberts*, 619 F.2d 379, 383 (5th Cir. 1980).

This evidence also satisfies the requirement of Rule 403. Any potential prejudice to Miller is outweighed by the probative value of this evidence given that the arrest took place within the period of the charged conspiracy and involved conduct similar to the charged conduct. *See*, *e.g.*, *United States v. Gonzalez*, 940

16

F.2d 1413, 1422 (11th Cir. 1991). The district court's cautionary instructions to the jury also limited any potential prejudice to Miller.

## C.     Trial Testimony and Motions for Mistrial

Finally, Miller contends that the district court erred by not granting a mistrial after Jasmin's and Pratt's testimonies that Miller had been in jail. A district court's decision not to grant a mistrial is reviewed for abuse of discretion. *Emmanuel*, 565 F.3d at 1334. "The district court is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury," and a defendant "must show that his substantial rights are prejudicially affected. This occurs when there is a reasonable probability that, but for the remarks, the outcome of the trial would have been different." *Id.* (quotation marks omitted). "The mere utterance of the word jail, prison, or arrest does not, without regard to context or circumstances, constitute reversible error *per se*." *Id.*

With respect to Jasmin's statement that Miller "had just got out of jail the day before," the district court did not abuse its discretion in denying Miller's motion for a mistrial. The record reveals that the statement, when made, was volunteered by Jasmin and not expected by the prosecutor. *See United States v. Veteto*, 701 F.2d 136, 139–40 (11th Cir. 1983) (holding that a mistrial was not warranted because the statement that the defendant "had been in prison before"

17

was volunteered, unexpected, and added nothing to the government's case). It does appear that the prosecutor attempted to elicit a repetition of the statement when he again asked Jasmin what he had told Miller about why Miller should not go with Danny Glover. While this may have been improper, the district court prevented Jasmin from answering, sustained an objection, and offered to give a limiting instruction to the jury. In any event, Miller has not shown that there is a reasonable probability that this statement changed the outcome of the trial. Given the remainder of Jasmin's properly admitted testimony about Miller's involvement in a drug conspiracy, this statement added nothing to the government's case. *See Emmanuel*, 565 F.3d at 1334–35 (holding that the court correctly denied a mistrial when the statement that the witness saw the defendant when the defendant "was signing in as a condition of bail" was brief and added nothing to the government's case). The district court, which was in the best position to evaluate the prejudicial effect of such statements, did not abuse its discretion in denying Miller's motion for a mistrial.

As to Pratt's statement that Miller had to stop delivering drugs "because he got arrested," the record reveals that the statement was not elicited but was volunteered. The court did advise the prosecutor to better prepare the witnesses and to avoid these areas of questioning but determined that a mistrial was not

18

warranted under the circumstances. Pratt's statement did not affect the outcome of the case and did not prejudice Miller's substantial rights. *See Emmanuel*, 565 F.3d at 1334–35. As such, the court did not abuse its discretion in denying Miller's motion for a mistrial.

## IV.  Conclusion

In sum, we find no reversible error in any of the issues raised by the appellants for reversing their convictions.

AFFIRMED.