[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10734
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cr-20013-JEM-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CARLOS EMILIO IBARGUEN PALACIOS,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 8, 2020)

Before WILSON, BRANCH, and HULL, Circuit Judges.

PER CURIAM:

In September 2016, Carlos Ibarguen Palacios ("Ibarguen Palacios"), a Colombian citizen, took three Cuban nationals on his boat through the Colombian waters towards the Panamanian border, where the aliens planned to continue their journey to the United States. During that trip, Ibarguen Palacios and another smuggler, Jhoan Stiven Carreazo Asprilla ("Carreazo Asprilla"), raped and murdered one Cuban national and murdered another. The third Cuban national escaped and alerted the Colombian authorities. Colombian law enforcement arrested Ibarguen Palacios and Carreazo Asprilla. The United States Department of Homeland Security ("DHS") identified the two smugglers as participants in an alien smuggling operation, and Colombia extradited them both to the United States. Ibarguen Palacios was then charged, and pleaded guilty to, one count of conspiracy to encourage and induce aliens to enter the United States, resulting in death, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and three counts of encouraging and inducing aliens to enter the United States, resulting in death, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). The United States District Court for the Southern District of Florida sentenced him to 540 months in prison.

On appeal, Ibarguen Palacios asserts the district court erred in three respects. First, he claims the district court wrongly imposed a two-level sentencing enhancement for the use of a special skill (navigating a vessel in open waters) in the commission of the crime. Second, he argues the district court erred in applying

a first-degree murder cross-reference because he did not commit the crime with malice and the underlying offense (alien smuggling) cannot serve as a predicate for the felony-murder rule.  Third, he asserts the district court abused its discretion in imposing a substantively unreasonable sentence of 540 months.  For the reasons that follow, we affirm.

## I.

In July 2016, two Cuban nationals, "E.M.A." and "L.S.C.," began their journey to the United States.  They flew from Cuba to Guyana, then illegally crossed through Brazil and Venezuela, arriving in Colombia in August 2016.  Once there, they sought to arrange transportation to smuggle them to Panama, Mexico, and ultimately, the United States.  While LS.C. and E.M.A. were staying at a hotel in Cucuta, Colombia, Jorge Fernando Rivera Weir ("Rivera Weir") approached them and offered to transport them to the Panamanian border.

E.M.A. and L.S.C. arranged and paid for the journey and the group continued to Turbo, Colombia.[1]  After the payment was received, Rivera Weir introduced E.M.A. and L.S.C. to his two associates: Ibarguen Palacios and Fredis Valencia Palacios ("Valencia Palacios").  Rivera Weir explained that Ibarguen Palacios and Valencia Palacios operated the boat that Rivera Weir used to transport

---

[1] E.M.A.'s family in Miami, Florida wired $500 to Rivera Weir as a down payment for the trip.  After the group arrived at a hotel in Turbo, Colombia, E.M.A.'s family wired an additional $1,400 to a person designated by Rivera Weir.

people through the Colombia rivers to the Panamanian border.  Ibarguen Palacios would captain the boat.

Ibarguen Palacios was no novice to the Colombian waterways: he had worked as a fisherman in Turbo, Colombia for approximately twelve years—since he dropped out of grade school to assist his father and brother, also fishermen.  As a fisherman, he earned the U.S. equivalent of $250 per month. [2]  To supplement these wages, Ibarguen Palacios planned to receive 200,000 Colombia pesos per alien for the trip—600,000 in total.

Although Rivera Weir only offered transport to the Panamanian border, the Cuban nationals intended to cross the United States border.  E.M.A. and L.S.C. told Rivera Weir, Ibarguen Palacios, and Valencia Palacios (together, the "smugglers") that they were travelling to the United States and planned to ultimately settle in Miami.  Another Cuban national, D.E.L.S., arrived at the hotel in Turbo and decided to join the group, informing the smugglers that he too was travelling to the United States.

On the morning of September 7, 2016, Ibarguen Palacios and another smuggler, Carreazo Asprilla, set off on a vessel with the three Cuban nationals,

---

[2] On the day that Colombian authorities arrested Ibarguen Palacios—September 10, 2016—one U.S. dollar was equal to approximately 2,919.71 Colombian pesos.  *See* XE Currency Converter – Historical Rate Table for 2016-09-10, *available at* https://www.xe.com/currency tables/?from=USD&date=2016-09-10 (accessed July 2, 2020).  Therefore, Ibarguen Palacios earned approximately 744,927.50 Colombian pesos per month as a fisherman.

4

heading towards the Panamanian border.[3]  Before the group departed, Carreazo Asprilla and Ibarguen Palacios agreed that they would rob E.M.A., L.S.C., and D.E.L.S. during the trip, because another smuggler had told them that the Cubans had "a lot" of money.  At some point during the trip, Ibarguen Palacios and Carreazo Asprilla executed their plan: Ibarguen Palacios brandished a firearm and Carreazo Asprilla pulled a knife on E.M.A., L.S.C., and D.E.L.S.  At Carreaz Asprilla's direction, Ibarguen Palacios tied the wrists of L.S.C. and D.E.L.S. and threw them overboard but pulled them up so their heads were just above the water and anchored them with rope to the inside of the boat.  Carreazo Asprilla and Ibarguen Palacios first took turns sexually assaulting E.M.A. and then killed her by cutting her throat.  Next, they brought D.E.L.S. back into the boat and then cut his throat, killing him.  While Carreazo Asprilla and Ibarguen Palacios struggled with D.E.L.S., L.S.C. freed himself from his bindings, swam away from the vessel, and hid in the surrounding mangroves.  Carreazo Asprilla and Ibarguen Palacios tried to find L.S.C., using flashlights to try to spot him in the mangroves, but eventually abandoned their search.

---

[3] The group, including Valencia Palacios, had attempted to leave on September 6, but shortly after departing, the boat began to take on water, forcing them to return to shore.  Ibarguen Palacios took the three Cuban nationals back to his home in Turbo, where they spent the night. They left on a different vessel the next day.  No information was provided as to why or how Carreazo Asprilla came to take the place of Valencia Palacios.

5

A local fisherman discovered LS.C. the next day.  L.S.C. directed the Colombian authorities to the location of the murders. There, the authorities retrieved the bodies of E.M.A. and D.E.L.S., which had their throats and stomachs cut open.  The bodies were tied together and submerged in the water.  L.S.C. also identified photographs of Rivera Weir, Ibarguen Palacios, Carreazo Asprilla, and Valencia Palacios as the men who had agreed to smuggle the victims.  He specifically identified Ibarguen Palacios and Carreazo Asprilla as the men who raped and killed E.M.A. and killed D.E.L.S.

Just three days after the murders, Colombian law enforcement officials arrested Ibarguen Palacios and Carreazo Asprilla at a hotel in Turbo, Colombia. The police recovered some of the victims' personal items in their hotel rooms, and discovered more of the victims' personal property, as well as the vessel used during the smuggling venture and a homemade firearm, in Ibarguen Palacios's home.  Ibarguen Palacio and Carreazo Asprilla pleaded guilty in Colombia to murder, rape, aggravated robbery, and femicide and were each sentenced to 43 years and 6 months in prison.

Following Ibarguen Palacios's arrest in Colombia, the United States Department of Homeland Security began investigating the smugglers for violations of the United States Code, and on December 5, 2016, Ibarguen Palacios was charged by complaint with conspiring to commit alien smuggling, attempting to

6

bring aliens to the United States, and encouraging or inducing aliens to come to the United States, all in violation of 8 U.S.C. § 1324.  On January 6, 2017, a grand jury in the Southern District of Florida returned an indictment charging Ibarguen Palacios with one count of conspiring to encourage and induce aliens to enter the United States, resulting in death, in violation of 8 U.S.C.§ 1324(a)(1)(A)(v)(I), and three counts of encouraging and inducing aliens to enter the United States, resulting in death, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv).  Colombia extradited Ibarguen Palacios, Carreazo Asprilla, and Valencia Palacios to the United States on November 9, 2017.[4]  As part of the extradition agreement, the United States assured Colombia that Ibarguen Palacios would not be sentenced to death or life imprisonment.

On October 26, 2018, Ibarguen Palacios pleaded guilty as charged in the indictment.  A probation officer prepared a presentence investigation report ("PSI") prior to sentencing.  Because the smuggling resulted in death, the probation officer applied the first-degree murder offense level found in § 2A1.1(a). The probation officer increased the base offense level by two points under §3A1.3, because the victims were physically restrained in the course of the offense.  The probation officer also determined that Ibarguen Palacios had used a special skill to facilitate the commission of the offense, and accordingly increased the offense

---

[4] Rivera Weir remains a fugitive.

level an additional two levels, consistent with § 3B1.3.  The offense level was decreased by three levels total: two for accepting responsibility and one for timely pleading guilty.  The resulting total offense level of 43, together with Ibarguen Palacios's criminal history category of I, resulted in a guideline imprisonment term of life.  The district court accepted these recommendations but varied downward from the guideline range of life and sentenced Ibarguen Palacios to 540 months in prison on each count to run concurrently.

## II.

Generally, this Court reviews the reasonableness of a sentence under the abuse-of-discretion standard.  *Gall v. United States*, 552 U.S. 38, 41 (2007).  The party challenging the sentence bears the burden of demonstrating that the sentence is unreasonable in light of the record, the factors listed in 18 U.S.C. § 3553(a),[5] and the substantial deference afforded sentencing courts.  *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015).  "In reviewing the reasonableness of

---

[5] The factors a district court must consider are:

(1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need "to reflect the seriousness of the offense;" (3) the need "to afford adequate deterrence to criminal conduct; (4) the need "to protect the public from further crimes of the defendant; (5) the need "to provide the defendant with . . . correctional treatment in the most effective manner;" (6)"the kinds of sentencing and the sentencing range established for the applicable category of offense;"  and (7) "any pertinent policy statement."

18 U.S.C.A. § 3533(a).

a sentence, we must . . . consider the totality of the facts and circumstances."

*United States v. Irey*, 612 F.3d 1160, 1189–90 (11th Cir. 2010) (*en banc*) (citing

*United States v. Pugh*, 515 F.3d 1179, 1192 (11th Cir. 2008).  We accept the

district court's findings of facts unless they are clearly erroneous.  *Irey*, 612 F.3d at

1190.  Still, we should consider "additional salient facts that were elicited, and

uncontroverted."  *Pugh*, 515 F.3d at 1192.

This Court reviews a district court's legal interpretations and applications of

the Sentencing Guidelines *de novo*, and its factual findings for clear error.  *United*

*States v. Rothenberg,* 610 F.3d 621, 624 (11th Cir. 2010) (quotation marks

omitted); *see also United States v. De La Cruz Suarez*, 601 F.3d 1202, 1219 (11th

Cir. 2010) ("The district court's legal interpretation of the term 'special skills' is

reviewed *de novo*, but whether the defendant possesses a special skill under §

3B1.3 of the Sentencing Guidelines is a factual finding reviewed for clear error.").

The sentencing court must consider all relevant conduct, as described in U.S.S.G. §

1B1.3, when determining a defendant's sentence, which this Court reviews for

clear error.  *United States v. Siegelman*, 786 F.3d 1322, 1332 (11th Cir. 2015).

Relevant conduct is defined broadly and includes uncharged conduct that is proven

by a preponderance of the evidence at sentencing.  *Id.* at 1332.[6]

---

[6] The Sentencing Guidelines define relevant conduct to include "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction . . . or in the

9

A.  The Special Skill Enhancement

This first question before this Court is whether the district court erred in applying the special skill enhancement.  Ibarguen Palacios received a two-level special skill enhancement because he "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.  A "special skill" is a "skill not possessed by members of the general public and usually requiring substantial education, training or licensing." *Id.* cmt. (n. 4).[7]  The district court determined:

> I think boat captain is a special skill, even [if it is] a crummy little leaky boat . . . .  I've seen the picture of the boat.  It's a crummy little leaky boat, but you know what, if I got into that and I was in Colombia, I would have a heck of a time getting down the little canals or estuaries and getting it to somewhere where I really wanted to go, and I probably would have sunk the first day.

On appeal, Ibarguen Palacios argues that his ability to pilot the boat through the Colombia waterways does not qualify as a special skill, and therefore the district court should not have enhanced his sentence.

We find the district court did not clearly err in finding that Ibarguen Palacios employed a special skill in piloting the boat from Turbo, Colombia to the

---

course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(A)-(B).

[7] The "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).

Panamanian border.  We have previously held that operating a boat for smuggling purposes is a special skill, particularly where the defendant did not rely on advanced technology.  In *De La Cruz Suarez*, the defendant piloted a boat, "overloaded" with Cuban migrants from Cuba to the Florida Keys, without the use of GPS or a satellite phone.  601 F.3d at 1219.  In concluding that the boat operation was a special skill, this Court emphasized that the defendant evaded the United States Coast Guard "us[ing] specialized knowledge of the area to find a predetermined location."  *Id*. at 1219.  Similarly, in *United States v. Calderon*, we held that the defendant possessed a special skill because he successfully "captain[ed] a cocaine laden boat on the high seas from the Bahamas to a predetermined specific location in Southern Florida using a chart and compass at night without lights while taking care to elude detection."  127 F.3d 1314, 1340 (11th Cir. 1997).

With those cases in mind, we turn to Ibarguen Palacios's "crummy little leaky boat."  Ibarguen Palacios contends that he could not have a special skill because "the boat in question was nothing more than a glorified rowboat with motors attached."  But the boat's lack of technological sophistication does not negate the skill used to operate it; indeed, it might even make Ibarguen Palacios's handling of it all the more impressive.  In *De La Cruz Suarez*, this Court noted that the skill involved in operating a boat at night "was a special skill, particularly after

11

the GPS and satellite phone were thrown overboard." 601 F.3d at 1220. Here, Ibarguen Palacios transported five people, including himself, on a small boat without lights, a GPS, or radio. And, in the dead of night, he directed that little boat to a dead-end canal, where the victims' bodies were found. Ibarguen Palacios clearly had a special skill.

Nor does it matter that Ibarguen Palacios did not receive any specialized education or licensing in order to operate the boat. In other contexts, we have held that a special skill requires neither licensing nor formal education. *Foster*, 155 F.3d at 1332. A person can obtain a special skill "through life experience and self-study." *United States v. Batista De La Cruz*, 460 F.3d 466, 468 (3d Cir. 2006). *See also United States v. Gandy*, 36 F.3d 912, 914 (10th Cir. 1994) (recognizing "that a defendant need not have completed formalized educational or licensing requirements in order to possess a special skill . . . a defendant's special skill can also be derived from experience or from self-teaching."). The record shows that Ibarguen Palacios worked as a fisherman in Turbo, Colombia from 2003 until September 2016. Over those years, Ibarguen Palacios developed the skill necessary to drive a boat through the waterways near his home in order to do his job.

On this point, we further note that Ibarguen Palacios was the designated boat driver in the smuggling gang and expected to be paid 200,000 Colombian pesos

per Colombian national for the trip. In comparison, Valencia Palacios (who was supposed to also be on the trip before Carreazo Asprilla replaced him) expected to be paid 100,000 Colombian pesos per Cuban national.[8] As this Court observed in *Calderon*,

> [A]ppellants were each payed [sic]. . . exponentially more than captains of similar boats receive for pleasure outings. While this tidy sum was no doubt inflated to reflect the profits involved with drug dealing and to offset the risk and consequences of getting caught attempting to smuggle cocaine into the United States, that still does not explain why appellants were paid far more for their role as captains than were other members of the crew. Similarly, why did captains have to be "recruited" for each load? If anyone could provide such services, why didn't existing participants in the conspiracy take on that role, thereby reducing the cost of the operation as well as the chances of detection? The obvious answer, we believe, is that captaining the boat required skills not possessed by the other participants.

127 F.3d at 1340.

The *Calderon* Court emphasizes points similarly applicable to the facts here: To captain the boat, Ibarguen Palacios was paid double that paid to the other participants in the scheme. What is more, another smuggler actively recruited Ibarguen Palacios for this specific role. Thus, Ibarguen Palacios's role in and payment for the alien smuggling operation indicate that his ability to operate the boat is a special skill.

---

[8] During post-arrest statements, Valenica Palacios informed the police that had worked as a boat captain in the past but was unable to do so this trip. He introduced Rivera Weir to Ibarguen Palacios and arranged to receive 100,000 pesos per Cuban national as a finder's fee.

13

Finally, Ibarguen Palacios makes a general objection to the district court's appraisal of his ability to operate the smuggling boat. He claims that "driving similar small boats in the canals around the area was commonplace and comparable to driving a car here in the United States," and therefore cannot be a special skill. True, a "special skill" is defined as a "skill not possessed by members of the general public." U.S.S.G. § 3B1.3 cmt (n. 4). *See also De La Cruz Suarez*, 601 F.3d at 1219 (observing that if an "average person off the street" does not possess the skill, then the skill must be "special." (quoting *Calderon*, 127 F.3d at 1339)). But this Court has never determined the ability of the "general public" based on geography and, for several reasons, we do not need to decide the scope of the inquiry here. First, Ibarguen Palacios provides no support for his evaluation of the capabilities of the people of Turbo, Colombia. In the absence of that evidence, we must rely on the evidence presented to the district court. Second, as discussed above, the evidence shows Ibarguen Palacios possessed a skill that the other smugglers (who were also from the area) did not possess. *See supra* at 12–13. Third, although "[t]he boat in question was not travelling on the open or high seas [and] instead the route involved local estuaries," the trip is not as simple as Ibarguen Palacios suggests. Let us go to the map.[9] In order to reach the

---

[9] Although the parties did not provide us a map, based on the undisputed evidence, we take judicial notice of a map of Colombia. *See* Fed R. Evid. 201(b),(c)(1); *State of Arizona v. State of California,* 283 U.S. 423, 452, (1931) ("[A] court may take judicial notice that a river

14

Panamanian border, Ibarguen Palacios needed to pilot the boat across a body of water called the Darien Gap to Acandi, Colombia. Although not an ocean, the Darien Gap is by no means a small canal or estuary: the most direct possible route between Turbo and Acandi is approximately 50 miles across that large body of water. And an indirect route around it (which someone avoiding detection would likely take) is an even greater distance. Ibarguen Palacios operated a small boat, at night, loaded with passengers, through these waters, without technology. We conclude that his ability to operate the boat in this manner qualifies as a special skill. Accordingly, the district court did not err in applying the two-level enhancement.

B. The First-Degree Murder Cross-Reference

Ibarguen Palacios's next claim on appeal is that the district court erred in applying a first-degree murder cross-reference at sentencing. Ibarguen Palacios was convicted of three counts of knowingly encouraging or inducing an alien to come to, enter, or reside in the U.S. and one count of conspiracy to commit that act in violation of 8 U.S.C.A. § 1324(a)(1)(A)(iv), (v)(I). Accordingly, the district court sentenced him pursuant to U.S.S.G. § 2L1.1, which governs smuggling

---

within its jurisdiction is navigable."); *United States v. Burroughs*, 810 F.3d 833, 835 n.1 (D.C. Cir. 2016) (taking judicial notice of Google map whose "'accuracy [could not] reasonably be questioned'" for relevant purpose (quoting Fed. R. Evid. 201(b)(2)); *United States v. Proch*, 637 F.3d 1262, 1266 n. 1 (11th Cir. 2011) (taking judicial notice of map of Fort Walton Beach, Florida).

15

offenses.  This provision specifies that "[i]f death resulted," from the defendant's crime, courts should "apply the appropriate homicide guideline . . ." U.S.S.G. § 2L1.1(c)(1).  Here, the district court chose to apply the first-degree murder guideline.  The commentary to the first-degree murder sentencing guideline explains that it applies (1) "in cases of premeditated killing" and (2) "when death results from the commission of certain felonies" (the felony murder rule). U.S.S.G. § 2A.1.1, cmt. (n. 1).  Section 2A1.1 incorporates 18 U.S.C. § 1111, the federal murder statute.  In accordance with § 1111, those certain felonies include arson, kidnapping, aggravated sexual abuse or sexual abuse, burglary, and robbery. 18 U.S.C. § 1111.[10]  Where, as here, the district court finds the cross-reference applies, the base offense level is 43.  U.S.S.G. § 2A.1.1(a).

Ibarguen Palacios claims that the first-degree cross reference does not apply to him because (1) the government failed to provide sufficient evidence that Ibarguen Palacios committed the murders with malice aforethought or

---

[10] 18 U.S.C. § 1111 defines first-degree murder as:

> [T]he unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

16

premeditation; and (2) the death arose out of the crime of alien smuggling, which is not a predicate felony for the felony murder rule.  Both of Ibarguen Palacios's arguments fail.

### 1.  Requisite Intent

Ibarguen Palacios first claims that he did not have the requisite intent to murder E.M.A. and D.E.L.S. because his co-defendant, Carreazo Asprilla, independently devised the plan to murder the Cuban nationals and threatened to kill Ibarguen Palacios if he did not assist him.

At the sentencing hearing, the judge expressed his concern with the application of the cross-reference, asking the government to "explain to [him] the rationale for first-degree murder.  It would appear that this is something that, although terribly serious, was not a premeditated matter, but a matter which evolved from the situation. . ."  In response, the government pointed out several facts indicating that both Ibarguen Palacio and Carreazo Asprilla acted willfully in murdering E.M.A. and D.E.L.S, including that: (1) Ibarguen Palacios drove the boat to a "dead-end," secluded area with which he was familiar, (2) after arriving in that location, Ibarguen Palacios grabbed a machete, (3) Ibarguen Palacios tied up the victims so tightly that the survivor's wrists are scarred, (4) Ibarguen Palacios said he wanted to rape E.M.A. and did rape her, (5) Ibarguen Palacios and Carreazo Asprilla cut both of the victims' throats and stomachs, and (6) Ibarguen

17

Palacios jumped in the water to search for the survivor, L.S.C.  In addition, the PSI reveals: (7) Ibarguen Palacios and Carreazo Asprilla brought weapons on board and used these weapons to commit the assault and murders, and (8) the conspirators tied the bodies together and submerged them in the water.

In its representation to the district court, the government recognized that Ibarguen Palacios initially objected to Carreazo Asprilla's instruction to tie up the victims and Carreazo Asprilla told Ibarguen Palacios that he would "die with them today" if he did not comply.  The government also acknowledged, "while [the murders] may not have been premeditated several days in advance, there was certainly an opportunity for reflection and deliberation."  Ibarguen Palacios did not raise any additional facts or dispute these facts, but emphasized that he was "put in a position where a man takes out a gun and says 'do something,'" and violence did not enter his mind prior to that.

The district court did not clearly err in concluding that these facts demonstrate that Ibarguen Palacios acted willfully and with malice aforethought.  Even assuming, as Ibarguen Palacios claims, that he and Carreazo Asprilla did not have a plan to kill the Cuban nationals prior to embarkation, the evidence shows that there was "enough time for [him] to be fully conscious of having the intent to kill."  Eleventh Circuit Pattern Jury Instructions (Criminal Cases), O45.1 (2016).  Moreover, Ibarguen Palacios acted deliberately prior to the murders: he drove the

18

boat to a secluded spot, tied the victims to keep them from escaping, and raped E.M.A.  Nor do the facts support Ibarguen Palacio's contention that Carreazo Asprilla forced him to murder E.M.A. and D.E.L.S.  Despite Ibarguen Palacios's single objection to tying the victims up, the overwhelming evidence shows he was a willing participant.  Ibarguen admitted to raping and killing E.M.A. and killing D.E.L.S.  He also pursued the sole surviving witness to keep him from escaping.

2.  Felony-murder

Ibarguen Palacios further argues that the first-degree cross reference does not apply because at the time of the murders, he was smuggling aliens, which is not a predicate felony for the felony murder rule.  But Ibarguen Palacios and Carreazo Asprilla killed E.M.A and D.E.L.S. during the perpetuation of a robbery and an aggravated sexual assault.  Carreazo Asprilla admitted that before they set out on the boat, he and Ibarguen Palacios planned to rob the victims.  Ibarguen Palacios did not rebut or object to this statement.  And following their arrest, Colombian authorities found the victims' belongings in Ibarguen Palacios's and Carreazo Asprilla's hotel rooms, as well as Ibarguen Palacios's home.  With regard to the sexual assault, although Carreazo Asprilla threatened Ibarguen Palacios when he initially refused to tie up the victims, Ibarguen Palacios readily participated in the rape of E.M.A. before he and Carreazo Asprilla murdered E.M.A. and D.E.L.S.  Moreover, Ibarguen Palacios pleaded guilty to robbery and rape in Colombia.

Both robbery and rape are predicate felony offenses that qualify Ibarguen

Palacios's murders for first degree murder.  18 U.S.C. § 1111(a).

In applying the felony-murder cross reference, a district court is not limited

to considering the crime with which the defendant was charged and convicted: "the

Relevant Conduct provision [of the sentencing guidelines] directs a court to

sentence a defendant for uncharged conduct germane to the charge-offense by

authorizing it to consider events before, during, and after the offense conduct."

*United States v. Ritsema*, 31 F.3d 559, 566 (7th Cir.1994); *see also United States v.*

*Behr*, 93 F.3d 764, 765 (11th Cir. 1996) ("This Court broadly interprets the

provisions of the relevant conduct guideline.")  Before the murders, Ibarguen

Palacios and Carreazo Asprilla raped E.M.A.  After the murders, they robbed the

victims.  Because the evidence supports the district court's finding that Ibarguen

Palacios engaged in predicate offenses for the felony-murder rule—robbery and

sexual assault—when he murdered the victims, the district court correctly applied

the first-degree murder cross reference.

C.  The Substantive Reasonableness of the Sentence

Lastly, Ibarguen Palacios claims his 540-month total sentence is

substantively unreasonable because the district court failed to adequately consider:

(1) that he is 27 years old and already serving a 43 year sentence in Colombia for

the same criminal acts, (2) that Carreazo Asprilla, not Ibarguen Palacios, was the

20

initial aggressor of the violence, and (3) that the government requested the district court apply a second-degree murder cross reference to another codefendant, Valencia Palacios.

As stated above, this Court reviews the reasonableness of a sentence under the abuse-of-discretion standard. *Gall*, 552 U.S. at 41. To be substantively reasonable, the district court must impose a sentence that is sufficient, but not greater than necessary, to comply with the factors and purposes listed in § 3553(a)(2). 18 U.S.C. § 3553(a)(2); *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016). The district court is not required to discuss each of the § 3533(a) factors: an acknowledgement that it has considered them will suffice. *United States v. Turner*, 474 F. 3d 1265, 1281 (11th Cir. 2007). Still, a district court abuses its discretion when it (1) fails to consider relevant factors that were due significant weight, (2) gives an improper or irrelevant factor significant weight, or (3) commits a clear error of judgment by balancing the proper factors unreasonably. *Irey*, 612 F.3d at 1187.

Ibarguen Palacios fails to demonstrate that his 540-month sentence is substantively unreasonable in light of the record, the factors listed in 18 U.S.C. § 3553(a), and the substantial deference afforded sentencing courts. Ibarguen Palacios argues that the district court should have weighed three factors more

heavily, but the district court has discretion as to what weight to afford any specific factors in § 3553(a).  *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007).

Moreover, before imposing the sentence, the district judge declared that he had "considered the statements of all the parties, the presentence report which contains the advisory guidelines and the statutory factors as set forth in 18 U.S.C. Section 3553(a).  A sentence will be imposed within the advisory guideline range as this will provide sufficient punishment and deterrence."[11]

Specific to Ibarguen Palacios's objections, the transcript reflects that the district court heard the parties' arguments concerning Ibarguen Palacios's sentence in Colombia,  Carreazo Asprilla's role in the murders, and the government's request for a second-degree murder cross-reference to Valencia Palacios.

We make three brief observations before concluding.  First, Ibarguen Palacios cites no case law, and we are not aware of any, requiring a United States district court to consider a defendant's sentence in a foreign jurisdiction when sentencing that defendant under the laws of this country.  Second, the district court affirmatively granted a lower sentence based on Carreazo Asprilla's comparative role in the murders.  When Carreazo Asprilla's threat towards Ibarguen Palacios came to light the day before the sentencing hearing, the government decreased its

---

[11] Although the district court announced that it was imposing a sentence within the Guidelines' range, in fact, the court departed downward from the Guidelines due to the extradition agreement with Colombia.

22

sentencing recommendation from 600 to 540 months.  The district court issued that lower sentence.  Third, the government's request that the second-degree murder cross-reference be applied to another codefendant is not inconsistent: that other defendant did not participate in the rape, murder, and robbery of the victims.  In fact, he was not even on the boat.

Considering the totality of the circumstances—including the district court's choice not to give weight to Ibarguen Palacios's Colombian sentence—and the district court's deliberation of the § 3553(a) factors and sentencing guidelines, we determine that the district court did not abuse its discretion in imposing Asprilla's sentence.

For the foregoing reasons we **AFFIRM** the district court's sentence.